in his official capacity as Secretary of Defense, appoint Mr. Berman for the appellate and Mr. Hathis for the appellate. Thank you and I'll make a version of the same two announcements we made the last time we were together, which is that Judge Henderson will give full consideration to this aspect of the appeal as well, based on the briefing submitted by the parties and a recording of the arguments today. And as we've indicated, we'll have a public session where there will be no reference to either of the two potential transferee countries, including the particular one that's most directly at issue for purposes of this aspect of the appeal, and then we'll go into a closed session where those countries can be named. Mr. Berman. Thank you, Your Honor. James Berman on behalf of the United States. I'd like to thank the panel for hearing our second appeal so quickly. We really appreciate it, and also for bifurcating the argument again. The district court's injunction in joining the transfer at issue was an error and should be vacated. Petitioner's legal rule and the legal rule underpinning that injunction reduce at bottom to the proposition that the U.S. military, when it captures a U.S. citizen or accepts custody of a U.S. citizen on a battlefield, has only two options. Its options are to prevail in habeas and detain that person until the end of hostilities, or after prevailing in habeas, transfer that person to another sovereign, or, on the other hand, turn that person loose on the battlefield. We don't believe that that rule — that, first of all, that rule is unprecedented, and, second, it does not follow from Valentine. And, indeed, it's contrary to the Supreme Court's unanimous decision in Munoz, as well as the plurality opinion in Hamdi that underlies all of the sort of modern jurisprudence of enemy combatancy in this context. But aren't there already Department of Defense directives, specifically Directive 2310.01E, that pertain to the Department of Defense detainee program, that provides for review by commander and judge advocate general of detainees and specifies the rights that U.S. citizens who are detained have? I mean, so it's not like it's unprecedented for there to be some sort of a neutral decision-maker review, the propriety of a detention of a U.S. citizen on the battlefield. No, certainly not, Your Honor. So to be candid, I'm not familiar with the directive Your Honor just cited. But certainly there can be an internal DOD process to ensure that we've made the correct determination about an individual. There's nothing unprecedented about that. Was that process followed here? In this process, as I understand it, there was a determination made by the commanders in the field based on the evidence they had that this person was an enemy combatant. My understanding is that there hasn't been any sort of formal adjudicatory process within the Defense Department. In part, I think, well, not necessarily because, but I think related to the fact that there's not been a decision, in fact, they've made the opposite decision about detaining the Petitioner until the end of hostilities. But these directives, these Department of Defense directives pertain not just to detention but to release or transfer. So, Your Honor, again, there's no allegation that the Defense Department hasn't complied with all of its internal policies on detention or transfer. Well, it would be nice if there were some sort of representation that you could make that they had complied with their own policies. Your Honor, I'm happy to file something with the Court this afternoon confirming that they have, in fact, complied. I'm confident that they have complied with their internal policies and directives, but I'm happy to confirm that for the Court and file something to that effect with a declaration if you'd like. So I'm a little uncertain on what role Doe's alleged enemy combatancy plays in the logic of your argument. Sure. Because as I understand your argument, it's predicated on Munaf, which is predicated on Wilson. And neither Munaf nor Wilson necessarily turns on enemy combatancy because they both draw on this principle that both decisions espouse to the effect that where an American citizen is present within the territory of a foreign country and is alleged to have committed a crime by that foreign country, the executive can transfer him to the custody of that foreign country for the criminal proceedings. Right. And it could have been for the crime of embezzlement, which obviously has nothing to do with war. So there's nothing necessarily about the principle that animates those cases that derives from enemy combatancy. Yes. I agree with that completely, Your Honor. I think the good faith determination of enemy combatancy is just helpful because it sort of takes off the table the more extreme hypotheticals where the military has detained someone they know is an innocent person and is, you know, preparing to transfer that person to some other. So it doesn't even have to be military detention. It could be any kind of U.S. custody, U.S. control over somebody abroad. And what Munaf and Wilson say is that the U.S. can always relinquish custody to the foreign country in which that person already is for the onset of criminal proceedings that the foreign country is interested in. So I think that is a correct interpretation of those decisions. I don't think this Court needs to address such a broad holding in this case. So I understand that you think the alleged enemy combatancy only heightens the ability to do it.  But I'm just trying to understand the principle. So can I just ask you a question about the principle? Or even with enemy combatancy, has there been an instance in which the United States has forcibly transferred an American citizen who is in one foreign country to the custody of another foreign country? So, I mean, in the interview with Torito, for example, which is a, I mean, that's a slightly different... Because Torito was in the U.S. I think he was captured in Italy, then brought to the U.S., and then sent back to Italy. And so they moved him around. And the Ninth Circuit was, you know, comfortable with that. And I think if you read the Court's opinion, there was no suggestion that that was only allowed because the Geneva Convention had a rule about repatriation of citizens. So we could talk about Torito, and I think it's an important case for our purposes. But has there been an instance in which the United States has forcibly transferred an American citizen who's on foreign soil to the custody of another foreign country? Different than the one they're in. So not Munoz, obviously. Right. So I'm not aware of a published opinion on that. But I think, Your Honor, that's largely a function of the fact that this has never been considered to be... Even if it's not a published opinion, are you aware of any instance in which it's happened? Not as I stand here, Your Honor. No. But I mean, I'm... So, no. But I'm confident that in many of our, you know, World War II and other global conflicts, there have been American citizens who were detained fighting for the other side. And that, you know, military transfers, as Judge Kavanaugh put it in Kiampa II, have historically happened without judicial oversight. Yeah. And that's definitely true with military transfers to some extent. I just didn't know if there's been an instance in which a known U.S. citizen who was detained abroad has been transferred to another foreign country. So once again, if Your Honor would like, I mean, I'm happy to... We're happy to do some digging on that. But I'm not... Certainly in the judicial opinions, I'm not aware of any time when a court has passed on the propriety of that. And I'm confident just probabilistically that there have been, you know, U.S. citizens that have been detained in past conflicts and that have been transferred. But I can't give you a specific example. And then I'll ask you one last question on this chain, which is outside the war context. So the war context is one which I can imagine there might have been an instance. Sure. Whether the U.S. knew that the person was a citizen or not, that might have happened. Outside the war context, are you cognizant of any example in which that has happened? So I'm not. And I do think that is a different context. So I think a person who's, you know, at the U.S. Embassy in France or something, and, you know, in some form of U.S. custody on, you know, in a peace, in a very clearly peacetime environment, I think that presents a lot of different issues. And I think in that context, the Valentine argument that the petitioner has made would have significantly more force, because then we're really talking about somebody who's on U.S. territory. I mean, an embassy is technically U.S. territory abroad. And I think there would be a much better argument that that's a case where you've got to go through the extradition process. But at least as I understand the logic of your position, and you've related it numerous times in your briefing, including at the beginning of the supplemental brief you helpfully supplied yesterday, it is predicated on, or at least starts with, the proposition that the potential transferee country has prescriptive jurisdiction with respect to the individual. Right? And so as a matter of international law. And prescriptive jurisdiction with respect to an individual as a matter of international law has nothing to do with enemy combatants. That jurisdiction can exist for all kinds of reasons. No, that's correct, Your Honor. So I think a perfectly, I think a sensible legal rule would be that the United States has the ability to relinquish someone captured and detained and held abroad to a country that has prescriptive jurisdiction and then where that transfer will comply with all of U.S. policies, in particular the ones requiring humane treatment and no torture. I agree that I don't think, you know. But even the way you just articulated it had nothing to do with enemy combatants. No, that's correct, Your Honor. So I, again, because we have made a good faith determination that this person is an enemy combatant, I think that the court can rule on a very narrow level. Right? It can rely on all the different factors at play here that make this case very similar in our view to Munaf. What is the definition of enemy combatant that you, that the government has used here? That's someone who has either joined or substantially supported al-Qaeda or an associated force. I mean, it depends on which AUMF we're talking about. But in essence, somebody that has joined or substantially supported the enemy force at issue. In this case, the ISIL. And so the determination the DOD has made is that. Is it any enemy or a specific enemy? It would need to be an enemy that falls within an AUMF or some other congressional authorization for force in the detention context. And in this case, it's ISIL. So we filed a factual return in the district court that's in the record. And there's a lot of evidence that Petitioner joined or substantially and or substantially supported ISIL. And that's, you know, how he came into our custody. Because as the Court is aware, he was captured on the battlefield fleeing ISIL-controlled territory as their government was collapsing, was captured by the Syrian Democratic forces on that battlefield, identified himself as an American and asked to. Is it your theory that ISIL is an associated force of al Qaeda? It is, Your Honor. I mean, you know, again, I don't think the Court needs to address these issues here. Because the Court does not have the detention question in front of it yet. And I think under Hamdi and under all those decisions, you don't need to get to that question until you're deciding whether we have the authority to detain Petitioner until the end of hostilities. But the answer. Sorry, please. But let's suppose the government is wrong and he's not, he's the errant tourist or journalist. You're saying that that's irrelevant legally for the transfer question. So I guess sort of. I think what I'm saying, Your Honor, is that the Court doesn't have, there's no judicial review of our determination that he is an enemy combatant. And I think that clearly flows from Munaf, where the Petitioners in Munaf said, you know, we are errant. They said they were errant translators, not errant journalists. But they said they were innocent people, they were U.S. citizens, they had done nothing wrong, and that the U.S. was proposing to just throw them to the Iraqi criminal justice system without any kind of legal process in the United States. I mean, that was their argument. And if you read Judge Tatel's opinion in Omar before the Supreme Court's opinion in Munaf that became Munaf, you know, it's, you know, he goes on at some length about those Petitioners' allegations. But this gets, this thing gets back to the question about whether Munaf had anything to do with enemy combatancy or necessarily did, because the transfer in Munaf wasn't under the laws of war. It doesn't have to, it wasn't undertaken because it was a wartime transfer as to which the military had authority under the laws of war. It was undertaken because of the same thing as Wilson. Wilson was not an enemy combatant. Wilson was a U.S. soldier. Sure. And it was in peacetime. And the Court relied entirely on Wilson for the idea that the U.S. can transfer somebody for criminal prosecution purposes. So the fact that Munaf did, it did involve at least one person who was asserted to be an enemy combatant and maybe both. But that fact, it wasn't salient to the transfer because the transfer wasn't a law of war transfer. So I don't, Your Honor, I don't disagree with anything you just said. So I think if you, if you read Wilson and Munaf together, a perfectly sensible rule that you can divine from those cases is that when somebody is captured and held abroad, they can be relinquished to a country that has prescriptive jurisdiction over that person, over them. I think that's basically what Wilson v. Gerrard was saying, because there the guy, the Petitioner in that case was in Japan, and they said, you know, Japan has control over things that happen within Japan. And the treaty that's been talked about, some in the district court, was not a treaty that gave the U.S. additional. Yeah. So I'm not, I'm not. You agree. I don't know if I disagree, but I'm not saying that. For purposes of the question. For purposes of the question, exactly. But then let me ask you about this good faith determination of enemy combatancy. So a good faith determination of enemy combatancy wouldn't be enough to justify a law of war detention for the duration of hostilities. Yeah. I think that falls from Hamdi. I mean, Hamdi's. Right. Right. So then what, what's the authority for the proposition that transfer to another country under the laws of war, which can be irrevocable and which can be beyond the duration of hostilities, the detention could be beyond the duration of hostilities, that that's lesser on the plane of outcomes for the individual such that it can be effected based on a good faith determination of enemy combatancy rather than on a Hamdi ratified designation of enemy combatancy? Well, so I guess, Judge Srinivasan, what I would say is I don't think it's based on our good faith determination of enemy combatancy. It's based on the receiving country's jurisdiction under international law to receive the person and the fact that the person traveled to a foreign country and was captured and is being held there. But then it starts to sound like enemy combatancy doesn't matter because if it's the recipient country's prescriptive jurisdiction, that exists without regard to enemy combatancy. Right. So I think, I guess the way I would think about it, Your Honor, is that the biggest, most important piece of our argument, in my view, is the Petitioner's voluntary presence in a foreign place and the receiving country's jurisdiction over that person under international law. But I think that there are other factors in this case that show why Article II authority and the executive's authority and the military's authority are sort of at their apex. So on the biggest factor then, which is I think you said the person's presence, voluntary presence overseas, and then the receiving country's prescriptive jurisdiction, right? I think those are the most critical parts of our argument, yes, Your Honor. So then let's imagine Valentine. In the Valentine situation, we know that Valentine couldn't have been extradited to France. The Supreme Court told us that. Right. Suppose Valentine gets on a cruise ship and goes to Mexico. So he's voluntarily present in Mexico. Undoubtedly, France has prescriptive jurisdiction over Valentine. Does that mean that in that situation the executive can forcibly transfer Valentine to France? I think that means that that is a different case than Valentine. But then your argument is the logic of your argument that the executive could do that. So to be clear, so I guess I have two responses, Your Honor. First, the French authorities could obviously, without any recourse for Valentine in U.S. law, apprehend Mr. Valentine while he's in Mexico. Yes. I think we all agree on that. I think Petitioner agrees with that. And so then the second question is just whether the United States can lawfully facilitate that process by itself apprehending Mr. Valentine and then delivering him to France. I think that's a much harder case than this, but I think that – I also think it's fairly clear that that would not be an extradition case. That would be something different, because I think extradition is about removing somebody by force from U.S. territory. I mean, it's a very significant thing from a matter of – from a legal perspective to leave a country's borders and go into another country's borders. And so I think if Mr. Valentine in that circumstance did what Your Honor has hypothesized, you know, I think that would be a tough case for him. And I don't think it would be at all – For him, it would be a tough case. Yes, it would be a tough case for both of us, I think. But it would be tougher for the government than this, I think. But I also think it would not be an a fortiori from Valentine at all. And can I just get your reaction to one last thing? Of course. Which is on this question of whether the government has authority to transfer based on a good-faith determination of enemy combatancy, even if the government couldn't detain for the duration of hostilities based on a good-faith determination of enemy combatancy. That's, I think, where we are. Well, so I don't think you can assume the second part, because I don't – we're certainly not conceding that we don't have the authority to detain the Petitioner until the end of hostilities. No, but based merely on a good-faith determination of enemy combatancy. I think you're conceding that because Hamdi requires more than that. Oh, certainly. So we're not suggesting – I mean, that's our whole point, that you don't have to go through the Hamdi process in order to give the government the authority to transfer. Exactly. And I think, Your Honor, that that flows directly from Munoz. So here's my question about that. As well as Hamdi. So here's my question about that. So the 2012 NDAA talks about dispositions under the law of war. And it says that the dispositions under the law of war include the following. Detention without trial until the end of hostilities, transfer to the custody or control of the person's custody of origin, any other foreign country or any foreign entity. So it seems like Congress contemplated in the 2012 NDAA that transfer to another country and detention for the duration of hostilities are on the same plane. Not that transfer is something that exists antecedent to and without the same process and showings that are intended to duration for the same. So, Your Honor, I don't have the NDAA here. Okay. But I guess I would just say that, you know, without seeing it, it's hard to really engage with what Your Honor has asked. But I don't think – no one has – the Petitioner has not suggested, and I have not until just now heard anyone suggest, that the NDAA was meant to confine the executive's authority to transfer individuals. In fact, as I recall, the NDAA is not even tied to citizenship, as I don't remember. But – Well, I think Congress specifically says that they're not speaking to the authority with respect to citizens that might or might not otherwise exist. No, no, right. But so that would be a much broader rule than the Petitioner has suggested, I think, that Your Honor has suggested, applying to noncitizens as well. And I don't think anyone thinks – I guess my point is simply that the NDAA treats with the subject of detention and transfer for purposes of the conflict that the government is saying is authorized by the 2001 AUMF against ISIL. And it seems to contemplate that detention for the duration of hostilities and transfer to another country are part and parcel of law of our authority, and they exist on the same plane rather than on different planes. So I think you could – you could – I think we could agree with all of that, and without that then meaning that Congress required a full round of habeas before those authorities are triggered. So just because Congress has acknowledged that that authority exists and has codified it, I think would only heighten – Could still be on different lines. It doesn't mean that there – Congress I don't think was saying, but again I don't have the text here, that these are identical, and that the executive has to go through the same rigorous judicial process that it has to go through to detain someone until the end of hostilities, which as we know can be a long time, in order to relinquish that person to a country that has jurisdiction over them. Okay. Thank you, Your Honor. Thank you. Mr. Havis. Good morning, Your Honor. It's Jonathan Havis from the ACLU. Your Honor, the government claims its position is narrow, but it's exceedingly broad. It's not only a distortion of MUNAF, but it's a direct assault on Hamdi in two respects. First, it's a direct assault on Hamdi. The notion that a good faith determination is simply enough for the transfer, a determination over a citizen's liberty, which is no different than over his continued detention. And second, if you listen to the government's position, they seem to say that release is not an option at any point, and it wouldn't matter if he were held in long-term detention. Nothing is different between now and then. I mean, in their world view, release is simply not an option. And so even if they decided to hold Doe long term, release would not be an option for them under Hamdi. Because if it's not an option now, why would it be an option in five years or ten years? Can I ask you this question? Do you disagree that when Doe initially was seized and then asked for or claimed U.S. citizenship, which I assume was essentially a call for the help of American forces, that the United States at that point could have taken him to a different place than Iraq? Yes, in U.S. custody. The United States, the executive has the prerogative to move Doe to a different U.S. detention facility. While it determines his status, it would have to be a safe facility. But we're not saying that the court could control which U.S. facility they bring Doe to. But the United States does not have, the executive does not have sole prerogative to render Doe to another country, another country's custody. Right, but in terms of when you say another country, you mean a country other than the one in which he's being held? Or do you mean any other country, including the one in which he's being held? Any other country. To the custody of any other government. The United States has control of Doe. The United States can move Doe to a different U.S. detention facility. While it assesses his status. But the United States can't hand Doe over to the custody of another government. Let's suppose, and I know you'll disagree with the premise, but just for argument purposes, let's suppose that Munaf, at least, supports the proposition advanced by the government that in Munaf someone was being held in Iraq and then was released to Iraq for the conduct of criminal proceedings against them. And the submission that the government's putting forward here is that if the transfer is based on the individual's alleged enemy combatancy in a conflict as to which either of the two transferee countries, the potential transferee countries, is an ally, then that is a very important interest too, like criminal prosecution. And Munaf supports the proposition that that transfer can happen to Iraq because he's in Iraq. And that's what I think Munaf, as the government reads it, says. But then if that's true, then that would suggest that a transfer of someone in that situation to the country in which they exist is more straightforward than a transfer of someone to a different country. Right. And I think that's one of the premises that's being put forward. And then if that's true, I guess my question is if the government could have decided to take somebody to another country in the first place in the circumstances of this case, then does that distinction start to break down? No, but I understand Your Honor's question. I mean, first of all, the government would need positive legal authority for any transfer of a U.S. citizen to the custody of another government, whether that's under the laws of war or in the case of a criminal proceedings. If it's under the law of war, it would have to be first established that the person is subject to the laws of war, that they're not the errant journalist, and that there's legal authority to hold them. And then the laws of war would potentially then authorize or could authorize a particular transfer, but they have to be subject to detention under the law of war. But they can't – but Munaf, they can't simply bring a U.S. citizen. The choice of where to bring a U.S. citizen, where the United States – what military base the United States wants to hold the citizen at, what's abroad or in the United States, does not affect that citizen's constitutional rights, nor does it alter the need for legal authority to transfer that citizen to the custody of a foreign government. And by legal authority to transfer, you mean it has to be either a statute or a treaty. That's your Valentine argument, that it has to be either a statute or a treaty. It has to transfer its authority at BIM. It has to be rooted in a statute or a treaty. It can't simply be some kind of ad hoc executive deal. It has to – the transfer has to be based at bottom in a statute or treaty. So the government's relying on Munaf, and at the end of the majority opinion in Munaf, there's a discussion about Valentine. And the upshot of that discussion seems to be the Court saying that the Petitioners in Munaf use Valentine to argue that this transfer can't happen. This isn't a Valentine case. So it's – in fact, what the Court says at page 706 is that the habeas petitioner contend that the executive lacks the discretion to transfer a citizen absent a treaty or statute. And then the next sentence is quite the opposite. Wilson forecloses that argument. So it sounds like what the Court has said in Munaf is that the argument that you're advancing, which is that the executive lacks discretion to transfer a citizen absent a treaty or statute, doesn't govern, at least in the circumstances of Munaf. You might have an argument that this is not the circumstances of Munaf, but the Supreme Court seems to be saying that the Valentine principle doesn't govern in the circumstances of Munaf. Yeah. Well, I mean, certainly, as Your Honor said, the other argument, the circumstances are not Munaf. But I think that the reading of that passage is – and this is how the D.C. Circuit, I think, has to be understood to have read it in Omar because they required – what I think the best reading of that passage is that the – that in those circumstances, in the case of a transfer within where a person is arrested, present, and is being prosecuted by the country that they travel to, right, a country that's on all fours of territory jurisdiction, as in Wilson and Munaf, in those circumstances, the statute or treaty itself doesn't need to explicitly authorize the transfer. It can be an agreement, as it was in Wilson, that's – that is entered into pursuant to a treaty. But it has to be based on a treaty or statute. And, in fact, in Munaf itself, there was positive legal authority for the transfer. There was a different provision of the 2002 AUMF, one the government doesn't rely on here, which authorized the United States to act as Iraq's police force and hold individuals in U.S. custody pending prosecution in Iraq. That was the positive legal authority in that case. But in – but in Munaf, in discussing Wilson, in the sentences that immediately follow the ones that we were just having an exchange about, the Court says the only authority at issue in Wilson is a status of forces agreement, which you just pointed to. But then what the Court says is that gave the petitioner in that case a right to be tried by an American military tribunal, not a Japanese – not a Japanese one. So it's saying that's not the kind of authority that Valentine required. Nevertheless, in light of the background principle that Japan had a sovereign interest in prosecuting crimes within – committed within its borders, the Court found no constitutional or statutory impediment. So it's relying on a background principle. Correct. And then with respect to constitution or statute, it's just asking whether there's a constitutional or statutory impediment. So the argument could be that in Munaf there's a background principle that the foreign country has a sovereign interest in prosecuting crimes committed within its borders. And in that situation, what we look at is whether there's a constitutional or statutory impediment, not whether there's affirmative statutory or treaty authority. And then the argument would be, is there a distinction between the circumstances of Munaf and the circumstances of this case? Yeah. Well, I'll – if I can – we can stay on the first point for a second. Yeah. Okay. So, Your Honor, I don't think that's the best or most accurate reading of Munaf nor the one that's implied in this Circuit's decision in the Omar case. Because Wilson itself, as the Court said there, said that they were – there was a – the authority to hand over the U.S. servicemember in Wilson was based on a treaty and an administrative agreement that was passed to the – that was agreed to for the treaty that authorized the U.S. to deliver Wilson to Japan, either because he was – the U.S. didn't have primary jurisdiction or was – in that case, the U.S. waived its jurisdiction. But the U.S. – there has to be a legal framework under which the United States is operating within a country and detaining people within that country and handing those people over to a foreign – to a foreign sovereign. And the authority at issue in Wilson, the status of forces agreement, that was the authority that spelled out the terms of the transfer. So, again, I think going back to the point that the discretion to hand over a U.S. citizen, it can be in an agreement, but that agreement has to be based in a treaty, which is – as it was in Wilson and as the transfer was in Munaf. Let's suppose – let's suppose we feel that the language that you refer to in Omar is dictum, in that the Supreme Court interpreted its own decision in Wilson, in Munaf, differently than you are, in that we believe that it's not – that there's not a requirement that it be a statute or a treaty as the positive legal authority. Do you lose? No, absolutely not, Your Honor. We don't lose, and I'll move to that point now. Munaf was based on a specific – holding in a specific sovereign interest about individuals who voluntarily travel to a country and submit themselves to its jurisdiction, commit crimes there, as under international law, the background principle of international law, that country has absolute and exclusive jurisdiction over that person. And all the cases that are cited, Munaf, Wilson, all the cases they rely on, going back to the Chief Justice Marshall's decision in Schooner, talk about the principle of territorial jurisdiction. That's – those are the confines of Munaf. The government is seeking an expansion, a significant expansion, an unprincipled expansion of Munaf to be able to transfer someone to a different country merely because they brought them. Why do you say it's unprincipled? Because the – you may think it's wrong, but I'm not sure it's unprincipled because the – what the government is arguing, as I understand it, is that Munaf supports the proposition that a transfer can occur for purposes of criminal prosecution. But that's not to the exclusion of contemplating a transfer for other purposes that seem really important to the recipient sovereign like criminal prosecution, including – so, for example, in Munaf, if the reason for the transfer was that the recipient country there, Iraq, was interested in the individual because they believe that the person might be an enemy combatant engaged in hostilities against Iraq, then the way – I think what the government would say is that Munaf would equally support a transfer of Munaf and Omar for those purposes, too. That case involved criminal prosecution, and that's a very important sovereign interest. But so is the sovereign interest in treating with individuals who are waging war against the country. But, Your Honor, but that would eviscerate Hamdi. I mean, because the basis – if the basis of the transfer, which the government skirts around but doesn't rely on, is enemy combatant status or determination that the person is an enemy combatant, then it's subject to review under Hamdi. Otherwise, the United States could simply take the errant – the errant journalist or whichever local aid worker and hand them over, based on their good faith determination, that the person is an enemy combatant. If you assume, as you are, that the authority to transfer a citizen requires the same antecedent showings as the authority to detain them for the duration of hostilities. Well, it has to be subject – it has to be – yeah, it has to be – they have to be subject to the law. Otherwise, if they're not subject to the authorization, they can just pluck someone who's not – who Congress has not authorized detention against and hand them over to another government based on executive say-so and same as to the factual basis. It would be an end run around the Hamdi decision. And the United States can't – well, the United States can bring a prisoner to a different country where the U.S. has a military base, assuming it has authority to operate a military base there, but that doesn't mean that they can hand that person over to that government just because they brought them to that country. Otherwise, the United States could simply take – have brought a petitioner to somewhere else, to Libya or Madagascar, if they had a base there, and said, that country has an interest. We're going to hand them over to that country. They're there now. It's like Munaf. Well, so I think that that is – that line of argument is predicated on the notion that the individual is forcibly taken to the country to begin with. And I think Munaf applies where the person is voluntarily – it at least applies in a situation in which the person is voluntarily present in that country. Right? Correct. Yes. So – and I thought, for your purposes, Doe sought the government's interest in getting to a safe place, and that safe place was Iraq. So why should we treat him as having been involuntarily taken to Iraq as opposed to having voluntarily gone to Iraq in the same way that the Munaf petitioner did, given that what happened here is that Doe understandably claimed American citizenship in an effort to gain the assistance of the United States authorities. And what the United States authorities decided was the best place to take him would be Iraq. He asserted – he didn't claim – he asserted, as the U.S. says, he asserted it. He didn't ask to get taken to Iraq. He was fleeing towards Turkey. He was asking for help, as many others fleeing the violence were. When he was arrested by Kurdish authorities, he asserted his citizenship. He's saying, I'm a U.S. citizen. I'm entitled to the protections by virtue of my citizenship. The United States chose to bring him to Iraq. He didn't ask to be brought to Iraq. They could have brought him to the United States, or they could have brought him to somewhere else. It doesn't matter where they brought him for purposes of his – the constitutional rights at issue here, his right to challenge his detention and his right to challenge his transfer to a foreign government, his forcible transfer to a foreign government. It doesn't – it's a right that's – it's rooted in the due process clause and the separation of powers, and that right attaches no matter where Doe is or is brought physically. If he voluntarily travels to a country and is arrested there and falls within the four corners of Munaf, that might affect the analysis, but he still has due process rights. Yeah. Does the Non-Detention Act do any work here? You don't cite it – you didn't cite it in any of your briefs before our court. It was cited before the district court. What, if any, relevance does it have to the questions we have before us? I think the Non-Detention Act reinforces the argument here. As Your Honors know, that act says expressly that a U.S. – the government cannot detain a U.S. citizen under any circumstances except pursuant to an act of Congress. And so what the Non-Detention Act reinforces is that the liberty of American citizens is not left to the sole power of the executive branch, whether that's for detention pursuant to a prosecution, detention pursuant – indefinite detention, or detention pursuant to transfer. That this is not some empty, unregulated space. Congress has taken great care to ensure that if American citizens are to be handed over to another – or to be detained, or if their liberty is to be compromised, there has to be expressed legislative authorization for that. And we've picked that issue extensively. So where was that in MNOF? Where was the express congressional authorization for the detention in MNOF? Well, the petitioners did not raise the Non-Detention Act. But as we've said, it was present in the 2002 AUMF, which said – again, a different point from the one the government has relied on in this case – that said the United States is empowered to enforce all applicable UN Security Council resolutions. And Resolution 1546 said that the United States has the power to intern, i.e. detain, individuals on behalf of Iraq. And that's what was happening in MNOF. They had traveled there. They were alleged to have committed crimes there. It could have been embezzlement. It wasn't. It didn't make a difference to the decision. And they were being detained by the United States as – in fact, by the multinational force, pursuant to this positive legal authority, and they were transferred, pursuant to this positive legal authority, to Iraqi custody for detention. And Judge Randolph's concurring opinion in the MNOF case in this circuit spells that out, I think, more clearly – or spells that out clearly. Do you think that the affirmative legal authority necessary to transfer is the same as the legal authority required to detain until the end of hostilities? It could be, but it doesn't need to be. So, in other words, it is possible that if petitioner were, in fact, found to be detainable under the AUMFs, the AUMFs could potentially authorize his transfer as the Geneva Conventions did in Torito, right? There, the petitioner said, I'm not a prisoner of war, and the court rejected that, said, no, in fact, you are as a matter of law and as a matter of fact, and based on that, you can be detained, and based on the Geneva Conventions, you could be transferred. The laws of war, they might allow a transfer to particular one country but not allow a transfer to another country. But, yeah. Are you suggesting that to the extent that there's a difference in the degree of authorization necessary as between detention for the duration of hostilities and transfer to another country, which way does that cut? Do you think – I'm not following. Do you think transfer might require more than what's necessary to detain for the duration of hostilities or less? The instrument authorizing detention, like the Geneva Conventions, could – that same instrument could authorize transfer. But what if the instrument doesn't talk about either detention or transfer? It's just an authorization to use military force, which we know from Hamdi authorizes detention. Of covered persons. Right. No, I understand. I understand that. But let's just assume – let's just assume for – I thought – and I thought what Judge Wilkins was asking, although I'm going to be corrected, is if you assume that the authorization for use of military forces – for use of military force encompasses this situation, and I know you have an argument that it doesn't, but let's assume that it does, do you think that that authorization is sufficient to cover not just detention but also transfer? Or do you think transfer requires more than that or that transfer could be accomplished even with less than that? Let me try again because I want to make sure I answer this question correctly. The – if, in fact, the petitioner were found to be an enemy combatant under the AUMF, as a matter of law, that the group the registrar belonged to was covered, and if, in fact, he was an enemy combatant, if that was conclusively determined by the courts, as Hamdi requires, and the United States sought to transfer a citizen under that authority, I mean, that's not before this court now, and I don't want to make the government's arguments for them, but it is possible that the AUMF, as informed by the laws of war, might permit transfer. I doubt it would permit transfer to any country. It might permit transfer to particular countries, but that's not – the government is not relying on the AUMF to transfer. If it were, they'd have to show he's detainable. If he's – if he's not covered by the AUMF, legally or factually, and they can't detain him, how in the world can they grab him, pick him up, and send him to another country? Separately, the government might have authority to transfer him totally outside the laws of war. So it doesn't – the government claims that it would need to show and litigate that he's an enemy combatant to detain him. That's not – I mean, to transfer him. That's not necessarily true. The government – there might be other positive legal authority, such as an extradition treaty with another country, if another country charged him with a crime and saw his extradition. So it's not – the law of war apparatus is not the exclusive means by which a potential transfer could be effectuated. There are potentially other means. Right. Well, Noff and Wilson at least tell us that, so. Right. But there has to be some kind of – there has to be some kind of law. Again, that – this goes back to our discussion before. That's based in the statute that all three branches have approved. And in Munoff – and I'm familiar with the case. I was one of the counsel in the case. The argument was that it wasn't just – the argument there was that the only way they could transfer Munoff was to detain him. So that's the argument I think it's best – the decision is best read as rejecting, that the government needed an extradition treaty to transfer the Petitioners in Munoff to Iraq. And the Court said it's not extradition because they were already in that – in that country. But – but let's suppose Munoff – we believe Munoff is best read to say that the territorial jurisdiction was sufficient, authority. The government says that's a form of prescriptive jurisdiction. So any form of prescriptive jurisdiction is sufficient authority then to allow transfer. I think that was the rule that your colleague on the other side articulated. So what's wrong with that rule? I think it's – it's not – it's unbounded. It's an unbounded rule, and it's not a faithful reading of Munoff. Munoff has expressed that it had to do with individuals who were arrested in a country where they had voluntarily traveled and which they were accused of committing crimes. And that's a principle of territorial jurisdiction, which is not the same as prescriptive jurisdiction. Territorial jurisdiction under international law is absolute, it's exclusive, it's that a sovereign reigns supreme within its borders. And international borders matter. They matter to Munoff. They matter today. And within those – within that – within that – under territorial jurisdiction, a sovereign has absolute power. Now, we submit you still need positive legal authority to transfer, perhaps not under international law, but under the U.S. Constitution when we're dealing with the rights of a U.S. citizen. But even if Your Honors don't accept that, Munoff is based on that principle of territorial jurisdiction and not prescriptive jurisdiction. Literally dozens of countries might seek to exercise prescriptive jurisdiction over a petitioner, but that doesn't mean that the United States can simply hand him off to those countries. And I don't think Munoff can be read to say that. In addition, the citizenship did not play a role in – dual citizenship did not play a role in Munoff. Thank you, Counsel. We'll give you two minutes for rebuttal and then we'll go to questions. Well, Your Honor, I'm happy to answer questions, but I think it might be easier if we just switch to the closed. Sure. Why don't we do that? Thank you. Stand, please. The Honorable Court will now take a brief recess. Thank you, Your Honor.
judges: Henderson, Srinivasan, Wilkins